IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| ROBERTA SHANK and BILL SHANK, d/b/a Chief's Janitorial, | ) ) ) | |
| Plaintiffs, | ) ) ) | Case No. 4:06CV3253 |
| vs. | ) ) | **MEMORANDUM AND ORDER** |
| ALLEN HORAK, Department of Roads, District 4 Operations and Maintenance Manager, individually; and ALAN GALAWAY, Nebraska Department of Roads, Maintenance Manager, individually, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

The plaintiffs, who had a written contract to provide janitorial services to the State of Nebraska, sue two state employees, *in their individual capacities only*, contending that those employees, while acting under color of law, violated the plaintiffs' constitutional rights to procedural and substantive due process and to freedom of speech. At bottom, the plaintiffs claim the defendants wrongly caused the termination of the plaintiffs' contract.

I do not know why the plaintiffs have pursued these constitutional claims in federal court, as opposed to pursuing contract claims in state court. Perhaps those state law contract claims have little monetary value. In any event, as compared to ordinary contract claims, the federal constitutional claims asserted against state employees in their individual capacities pose a far higher hurdle for the plaintiffs to overcome.

With the foregoing in mind, I have waded through the parties' voluminous submissions to see whether there is enough of a constitutional case to warrant a trial.

Deciding that no such trial is warranted, I will grant the defendants' motion for summary judgment.

## *I. BACKGROUND*

The evidentiary record submitted by the defendants includes the affidavit of Alan Galaway, the affidavit of David Cassidy, the affidavit of Allen Horak, the deposition of Roberta Shank, the contract at issue, and various items of correspondence and e-mails. (Filing 32-2, Index of Exhibits.) The plaintiffs have submitted no additional materials.

Without intending to be unkind to the able lawyers, neither parties' statements of fact (or briefs) are particularly helpful.[1] As a result, I have had to mine the underlying record to determine what facts are material and whether those facts are genuinely disputed. Having now completed that task, I find and conclude that the following are the key facts and, for purposes of the summary judgment motion, I believe that there is no genuine dispute about them:

1. Plaintiffs Roberta and Bill Shank, doing business as Chief's Janitorial, had a written contract with the State of Nebraska for a term of years to clean and maintain rest area facilities at the York interchange on Interstate 80. The contract ran from October 1, 2004, to September 30, 2007. (Filing 32-5, at CM/ECF p. 17.) I assume, without deciding, that the contract was terminable only for cause associated with non-performance of the contract conditions. (Filing 32-5, at CM/ECF p. 17 (providing that the contract could be terminated "in the event the Contractor unsatisfactorily performs the duties previously listed").) The contract was long and

---

[1]Part of this problem can be traced to the failure by both sides to fully and carefully comply with the requirements of NeCivR 7.1 and 56.1. While counsel may not believe it, we write the local rules to help them with their advocacy.

provided a detailed list of specifications and requirements (filing 32-5, at CM/ECF pp. 19-26) which were to "be performed to the satisfaction of the Department [of Roads.]" (Filing 32-5, at CM/ECF p. 15.) The contract specifically provided that "[u]nsatifactory conduct by Contractor's employees shall be grounds for termination of the contract." (Filing 32-5, at CM/ECF p. 19.) Under the terms of the agreement, the State of Nebraska was not required to follow any particular procedures in order to terminate the contract. (*Id.*) For the sake of simplicity, I call this agreement the "York contract."

2.     The plaintiffs also had two additional written contracts with the State of Nebraska for a term of years to clean and maintain other rest area facilities in different parts of the State of Nebraska. (Filing 32-4, at CM/ECF p. 17.) Those contracts were not terminated. (Filing 32-4, at CM/ECF p. 78.)

3.     Allen Horak, a defendant, was the person at the Department of Roads responsible for the overall administration of the York contract. (Filing 32-5, at CM/ECF p. 1 (providing that the "Contact Person" for the contract was "Allen Horak . . . .").)

4.     Alan Galaway, a defendant, was the "maintenance supervisor" at the Department of Roads who had the day-to-day responsibility for making inspections of the rest areas covered by the York contract to determine whether the plaintiffs were complying with the terms of the contract. (Filing 32-5, at CM/ECF p. 20 (providing that "Mr. Alan Galaway" was to have "overall control of that Rest Area" under the contract).)

5.     David Cassidy, a "maintenance superintendent," oversaw Alan Galaway and three other "maintenance supervisors" like Galaway. (Filing 32-3, at CM/ECF p. 1.) Cassidy reported to Alan Horak, who was "next in the chain of command . . . ." (*Id.*) Cassidy is not a defendant. Cassidy claims to have attended inspections at

the York rest areas at least once each week and claims to have personally observed destruction of lawns due to improper mowing, failure to insure personnel at the rest area for extended contract periods, failure to clean even once a day despite the contract requirement that cleaning take place three times a day, and various other deficiencies. (Filing 32-3, at CM/ECF p. 2.) Based upon input and discussions with Roberta Shank and others in addition to Alan Galaway, and his own personal inspections, Cassidy claims to have provided his opinion in March of 2006 "to Mr. Horak that I believed the problems with Chief's performance at the York rest areas were severe enough to justify termination." (Filing 32-3, at CM/ECF pp. 2-3.)

6. Carrie Keezer and Mike Keough were among the employees of the plaintiffs who worked at the rest areas covered by the York contract (filing 32-4, at CM/ECF pp. 27-30), and their names appear prominently in the relevant correspondence. (*See*, *e.g.*, Filing 32-6, at CM/ECF pp. 19, 21, 22, 24.) Roberta Shank was aware when these employees worked for her that Keezer had a felony criminal record for which she served 18 months in prison and that Keough had a criminal record for which he served time in jail. (Filing 32-4, at CM/ECF p. 46.) Shank believed that both employees' criminal problems were drug-related. (*Id.*) In particular, she believed that Keezer had been in jail for methamphetamine abuse. (Filing 32-4, at CM/ECF p. 44.)

7. The entirety of the summary judgment record establishes that Roberta Shank, as opposed to her husband (Bill Shank), dealt primarily with the York contract.

8. I assume that Roberta Shank sincerely believes that the York contract was terminated for unjustifiable reasons. Nonetheless, she admitted significant deficiencies in the plaintiffs' performance of the York contract *before* the contract was terminated *and* both *before* and *after* Shank's conversation with Cassidy in August 2005 (discussed in paragraph 9 below). For example:

> A. On May 22, 2005, Roberta Shank provided the State of Nebraska with a copy of a letter admonishing one of her male employees in writing for the lack of cleanliness of the York east-bound rest area, the failure to plant seed left by the State of Nebraska, leaving the rest area without staff during contract hours, missing parts, and the unauthorized "borrowing" of the plaintiffs' maintenance equipment. (Filing 32-6, at CM/ECF p. 18.) Shank authored and sent the letter as a warning so that she would have a justification to fire the employee later, but upon receipt of the letter, the employee resigned. (Filing 32-4, at CM/ECF p. 86.)

> B. On November 16, 2005, Roberta Shank sent David Cassidy an e-mail stating, among other things, that "I know I have some issues I have to deal with [at the York rest areas]" and "I think it will be Carrie and Mike who have to go." (Filing 32-6, at CM/ECF p. 19.) Indeed, she asked Cassidy for help in finding employees to work at the York rest areas. (*Id.*)

> C. Regarding the condition of the York rest area over two days in early February of 2006, Roberta Shank acknowledged in writing to Allen Horak that "I know . . . the bathrooms were deplorable." (Filing 32-6, at CM/ECF p. 25 (letter from Shank to Horak dated March 19, 2006).) Mrs. Shank added that she "kn[e]w that the incident . . . was terrible . . . ." (Filing 32-6, at CM/ECF p. 26.) Mrs. Shank admitted that "the part time attendant that was to be there . . . did not show up for work" and "[h]e was terminated immediately." (Filing 32-6, at CM/ECF p. 25.)

9. Central to the plaintiffs' complaint is a telephone conversation that Roberta Shank claims she had with David Cassidy in August of 2005. In short, Shank

claims that she told Cassidy about statements that Carrie Keezer had relayed to Shank about Alan Galaway acting or speaking in a sexually inappropriate manner regarding Keezer.[2] The following are the important facts relative to that alleged conversation:

A. In August of 2005, Shank called Carrie Keezer to discuss complaints Shank was receiving about Ms. Keezer's work, and during that conversation, Keezer told Shank that Alan Galaway was saying "inappropriate things to her" and that Galaway was "sexually harassing her." (Filing 32-4, at CM/ECF pp. 39-40.)

B. After talking with Keezer, Shank called Cassidy. (Filing 32-4, at CM/ECF pp. 47-48.) She did so because it was her "job as an employer to make the report." (Filing 32-4, at CM/ECF p. 49.)

C. Shank does not believe she told Cassidy anything specific, but she may have told him that Galaway "was making comments to [Keezer] about her shape, her tits, things like that . . . [and] time in prison." (Filing 32-4, at CM/ECF p. 50.) She also may have told Cassidy that Galaway "picked her [Keezer] up and turned her, like, upside down." (Filing 32-4, at CM/ECF p. 49.) Shank never discussed this matter again with Cassidy and did not further pursue the report she made to Cassidy. (Filing 32-4, at CM/ECF p. 53.)

---

[2]Cassidy agrees that he had several telephone conferences with Shank, but he denies that she told him anything about Keezer's complaints regarding Galaway's alleged inappropriate conduct. (Filing 32-3, at CM/ECF p. 3.) For purposes of the summary judgment motion, I assume that Shank had a conversation with Cassidy where she relayed to Cassidy Keezer's complaints.

    D.    At the time Shank spoke to Cassidy, she "wasn't totally convinced that Alan [Galaway] was doing it." (Filing 32-4, at CM/ECF p. 53.)

    E.    Shank admits that she never told Galaway about Keezer's claims. (Filing 32-4, at CM/ECF p. 54.)

    F.    Until the contract termination process was begun in March of 2006, Shank admits that she never told Horak about Keezer's claims. (Filing 32-4, at CM/ECF pp. 53-54.)

    G.    There is no evidence that Cassidy said anything to Galaway or Horak about Keezer's claims allegedly recounted to him by Shank. (*See*, *e.g.*, Filing 32-3, Cassidy Aff., at CM/ECF p. 3; Filing 32-4, Shank Depo., at CM/ECF p. 54.)

    H.    Galaway has sworn that he knew nothing of Keezer's claims until after this lawsuit was filed. (Filing 32-8, at CM/ECF p. 5.)

    I.    Horak has sworn he knew nothing of Keezer's claims until the termination process was already under way in March of 2006, at which time Shank spoke to him by phone of her concerns regarding Keezer's claims. (Filing 32-6, at CM/ECF p. 5.)

    10.    In September of 2005, Roberta Shank met with Cassidy and Galaway to discuss concerns about whether Keezer was abusing drugs again. (Filing 32-4, at CM/ECF pp. 42-43.) At that time, according to Shank, Galaway stated that when Keezer "first started here, she had a cute little figure[,]" but "[n]ow she has no tits. . . . [r]eferring to how thin she was." (Filing 32-4, at CM/ECF pp. 43-44.) In November of 2005, and apparently in response to the earlier conversation about

Keezer's questioned drug abuse, Shank wrote Cassidy and stated, among other things, "I plan to investigate whether I have [a] right to ask for a drug test" and "I am now finding out that she [Keezer] has probably been jerking me around." (Filing 32-6, at CM/ECF p. 19.)  Subsequently, in December of 2005, Shank wrote Cassidy and said, "I do appreciate all you guys do for us" and "[y]ou and Alan have been great." (Filing 32-6, at CM/ECF p. 21.)   She added that "Carrie is skinny but her eyes were not dilated and her rest area was clean." (*Id.*)  Shank then commented, "We will see how it goes." (*Id.*)

     11.    Following the problems of early February of 2006 (which, as discussed above, Shank admitted were "deplorable" and "terrible"), a Nebraska Department of Roads employee claimed that he and his family, who were from Sidney, Nebraska (roughly 300 miles west of York), stopped at the York rest area on March 5, 2006, as they were returning home.  (Filing 32-6, at CM/ECF p. 14.)  The employee's name was Dennis Connot.  On March 14, 2006, Connot wrote an e-mail to Horak bitterly complaining about the conditions at York, and the absence of an attendant, on March 5, 2006.  Among other things, he stated that he found that the "rest area was so filthy . . . I wouldn't have watered a cow in it." (*Id.*)  Horak forwarded the e-mail to the Department's legal counsel on March 15, 2006. (*Id.*)[3]

     12.    On March 16, 2006, Horak sent the plaintiffs a detailed letter threatening to terminate the contract, setting forth a specific, but not all-inclusive, list of complaints (focusing on the incidents in February of 2006) and warning that the Department of Roads "believes the matters set forth above may constitute sufficient grounds to permit it to exercise its rights under Section 19 [of the contract] but wishes

---

[3]While Shank "controverts" this information, she does not deny that Connot sent the e-mail.  Rather, she states that she was not given a copy of it until her deposition was taken after this lawsuit was filed. (*Compare* Filing 41, at CM/ECF p. 10 ¶ 24 (defendants' statement of facts) *with* Filing 43, at CM/ECF p. 9 ¶ 18 (plaintiffs' response to defendants' statement of facts).)

to provide you the opportunity to respond." (Filing 32-6, at CM/ECF pp. 15-16.) Horak gave the plaintiffs 10 days to respond.

13. On March 19, 2006, Roberta Shank responded in writing to Horak's letter. (Filing 32-6, at CM/ECF pp. 25-26.) While she admitted that there had been serious problems in early February of 2006, she generally denied that there were grounds to terminate the contract. Shank implied that Galaway and perhaps others were looking for reasons to complain as a pretext[4] for contract termination, but Shank did not specifically mention Keezer's complaints about sexual harassment or her alleged conversation about that matter with Cassidy.

14. After Shank got the March 2006 letter from Horak, she went to Carrie Keezer and told her to write down the specifics of Galaway's alleged bad behavior. (Filing 32-4, at CM/ECF p. 51.) That was the first time that Shank was aware of the "crudeness" of the remarks. (*Id.*) It is from that list, obviously prepared in anticipation of litigation, that the specific allegations in the complaint regarding Galaway are derived. (Filing 32-4, at CM/ECF p. 50.) To be sure, if Galaway made the remarks or engaged in the conduct attributed to him in the complaint (*see* filing 21, at CM/ECF pp. 2-4 and ¶ 8a-8m), a reasonable woman would have found such behavior terribly offensive.[5]

15. Horak claims that on March 24, 2006, he received a complaint from a Noella Brown, a female member of the traveling public, reporting that "she had been

---

[4]For example, Shank's letter stated: "It seems after I received a sexual harassment complaint last summer and I verbally passed it on, I have had a lot more complaints from the Department." (Filing 32-6, at CM/ECF p. 25.)

[5]While Galaway denies it, for purposes of the summary judgment motion, I assume that he made the remarks or engaged in the conduct regarding Keezer attributed to him in the complaint.

verbally harassed with comments of a sexual nature by an individual named 'Mike', who was working as a janitor at the York Eastbound rest area." (Filing 32-6, at CM/ECF p. 3.) On the same day he claims he received the complaint, Horak passed the complaint on to the Department's lawyer. On March 24, 2006, the lawyer wrote the plaintiffs. (Filing 32-6, at CM/ECF p. 29.) Without naming the woman who made the complaint, the lawyer described the complaint (including the reference to "Mike"), requested that the plaintiffs take immediate steps to investigate, and asked the plaintiffs to immediately contact Horak. *(Id.)*[6]

16. After she got the letter about a member of the traveling public, Shank contacted her employee, Mike Keough. (Filing 32-4, at CM/ECF p. 59.) Keough remembered the incident and stated that "he was shoveling snow and this lady came up to him and tapped him on the shoulder and tried to get him into a conversation. He felt he had not said anything inappropriate to her." (*Id.*)

17. Prior to the termination of the contract, Shank had two telephone conferences with Horak. (Filing 32-4, at CM/ECF p. 64.) Before these conferences took place, Shank had received the letter threatening termination and the letter advising Shank of the sexual harassment complaint by the female member of the traveling public. (Filing 32-4, at CM/ECF pp. 64-65.) During these conferences, Shank was given the opportunity to "plead[] [her] case." (Filing 32-4, at CM/ECF p. 71.) Horak was courteous. (Filing 32-4, at CM/ECF p. 77.) For example, while discussing the complaint about "Mike," Shank brought up her concerns about Galaway. (Filing 32-4, at CM/ECF p. 66.)

---

[6]The plaintiffs do not deny the information contained in this paragraph. (*Compare* Filing 41, at CM/ECF p. 13 ¶ 29 (defendants' statement of facts) *with* Filing 43, at CM/ECF p. 10 (plaintiffs' response to defendants' statement of facts containing no reference to paragraph 29 of the defendants' statement of facts).)

18. After the telephone conferences between Horak and Roberta Shank, and on March 27, 2006, Horak wrote the plaintiffs, terminating the contract effective at 4:30 p.m. on March 29, 2006. (Filing 32-6, at CM/ECF p. 30.)

19. Under Nebraska law, persons like the plaintiffs may seek relief from contract terminations like the one involved in this case by adhering to the procedures set forth in the "State Contract Claims Act." *See* Neb. Rev. Stat. §§ 81-8,302 *et seq.* (West 2007). Following procedures established under the Act, any party to a state contract that is wrongly terminated is permitted to litigate his or her claim before the State Claims Board or the Lancaster County Nebraska District Court. Neb. Rev. Stat. § 81-8,305 (West 2007).

## *II. ANALYSIS*

In their amended complaint, the plaintiffs assert two claims. The first claim is that the defendants took the property interest represented by the contract from the plaintiffs without due process of law in violation of the Fourteenth Amendment. (Filing 21, at CM/ECF p. 4 ("First Cause of Action").) The second claim is that the defendants' termination of the contract was motivated by the plaintiffs speaking out on matters of public concern in violation of the First Amendment. (Filing 21, at CM/ECF pp. 4-5 ("Second Cause of Action").)

The defendants based their summary judgment motion on the defense of qualified immunity and also on the merits. Their arguments focus on the merits, however, and so shall I.

### *Due Process*

While it is difficult to tell, the plaintiffs apparently assert a procedural due process claim coupled with a substantive due process claim. If so, both lack merit.

First, assuming the contract created a property interest, the plaintiffs were given all the procedural process they were due. There is no evidence or claim that the defendants failed to comply with any termination provision contained in the detailed written contract between the parties. Prior to the termination of the contract, the plaintiffs were given specific notice of the problems and the plaintiffs were given an opportunity to respond. They were able to, and did, respond both in writing and orally. Had they wanted to do so, the plaintiffs also could have sought the procedural protections of the State Contract Claims Act that would have provided them with fully independent review of the termination. Still further, I have found no cases, and the parties have provided none, that call for different or other procedural protections in contract cases like this one.

Accordingly, the motion for summary judgment must be granted on the merits because the plaintiffs were given all the procedural due process the Constitution requires. *See*, *e.g.*, *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that no evidentiary hearing is required prior to the termination of social security benefits and stating that the factors to be considered when determining what process is due are (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation and the probable value of additional procedural safeguards; and (3) the fiscal and administrative burdens that any additional procedural requirements would impose). *See also Wilkinson v. Austin*, 545 U.S. 209, 224-225 (2005) (holding that informal and non-adversary procedures for placing inmates in a "supermax" prison were adequate and applying *Mathews*).[7]

Second, assuming the contract created a property interest, the plaintiffs' substantive due process claim fails as well. In order to show that contract termination

---

[7]Even if the procedures used were found to violate the procedural due process requirements of the Fourteenth Amendment, both defendants would surely be entitled to qualified immunity. The plaintiffs have cited no cases from which a reasonable official would have known that some other process was required.

was actionable under the Constitution, the plaintiffs must "meet[] the Supreme Court's rigorous 'shocks the conscience' substantive due process standard." *Neal v. Fields*, 429 F.3d 1165, 1166 (8th Cir. 2005) (state licensing board's disclosure of ongoing investigation to potential employers, coupled with board's failure to hold prompt name-clearing hearing, did not shock the conscience and thus did not violate nurse's substantive due process rights). Given Roberta Shank's admissions that there were serious problems with the plaintiffs' performance of their side of the contract, and even assuming (for the sake of argument) a bad motive on the part of Horak and Galaway, the termination comes nowhere close to shocking the conscience. *See*, *e.g.*, *Omni Behavioral Health v. Miller*, 285 F.3d 646, 651 (8th Cir. 2002) (affirming grant of summary judgment and holding that the termination of a contract to provide foster care services did not violate the plaintiff's right to substantive due process because the plaintiff failed to establish that the termination was "'arbitrary, or conscience shocking, in a constitutional sense,'" even though the termination was based on a child abuse investigation that ended with the dismissal of, or acquittal on, all charges) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (in turn quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)).)

*Free Speech*

The plaintiffs claim that they wrongly lost their contract because of protected speech. As best as I understand it, the plaintiffs claim they were punished (1) for what Roberta Shank allegedly told Cassidy in August of 2005 about Galaway allegedly sexually harassing Keezer and (2) for what Robert Shank allegedly told Horak in March of 2006 about Galaway's alleged harassment of Keezer when Shank was trying to convince Horak not to terminate the contract.

To prevail on their speech claim, the plaintiffs must prove two things: (1) that Roberta Shank engaged in speech protected under the First Amendment and (2) that such speech was a "substantial" or "motivating" factor in the termination. *See*, *e.g.*,

*Board of County Commissioners v. Umbehr*, 518 U.S. 668, 675 (1996) (dealing with the First Amendment in regard to the termination of a trash hauling contract). Importantly, contractors like the plaintiffs are protected under the First Amendment to an extent similar to the protections afforded state employees. *Id.* at 678-679.

The summary judgment record establishes that Roberta Shank's speech was not protected. Furthermore, there is insufficient evidence from which a reasonable fact-finder could conclude that Shank's speech motivated the termination.

First, I turn to the question of whether Roberta Shank engaged in protected speech. The question of protected speech is a matter of law for the court to decide. *See*, *e.g.*, *McGee v. Public Water Supply*, 471 F.3d 918, 920 (8th Cir. 2006) (holding that manager of county water supply district was not speaking as a citizen when he made statements questioning environmental compliance on two projects) (citing *Connick v. Meyers*, 461 U.S. 138, 148 n.7 (1983)).

It is clear beyond dispute that Shank was speaking as a part of her duty as a contractor and not as a public citizen. Indeed, that is exactly what she said she was doing in her deposition when she stated that it was her "job as an employer to make the report." (Filing 32-4, at CM/ECF pp. 48-49.) Furthermore, it is obvious that Shank was not speaking as a citizen, but rather as a party to a contract seeking to protect her parochial interests in that agreement. Accordingly, there is no First Amendment protection for Shank's statements to Cassidy or Horak about Galaway's alleged bad behavior regarding Keezer. *See*, *e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 1959-1960 (2006) (district attorney was not protected under the First Amendment for writing a memorandum in which he recommended dismissal of a case due to governmental misconduct; focusing on whether the employee was speaking pursuant to his duties).

Second, and regarding the issue of causation, it is necessary to focus on the knowledge of each of the defendants. Nonetheless, and in both cases, proof that the speech, protected or otherwise, motivated the termination is sorely lacking.

Insofar as Galaway is concerned, there is simply no evidence that he knew of Shank's complaints regarding Keezer. Therefore, there is no basis from which a reasonable fact-finder could conclude that Shank's speech caused Galaway to act to the detriment of the plaintiffs.

Regarding Horak, by the time that Shank spoke to Horak about her concerns regarding Galaway and Keezer, the contract termination process was too far along for the accusation to matter. At the time that Shank told Horak about Galaway, the following things had already happened: (1) a formal notice threatening termination had been given[8]; (2) Shank had admitted serious deficiencies in the plaintiffs' performance of the contract; (3) Dennis Connot had told Horak that the "rest area [was] so filthy . . . I wouldn't have watered a cow in it"; and (4) a member of the public had complained to Horak about sexual harassment on the part of one of the plaintiffs' attendants. Furthermore, there is no claim that Horak was personally implicated. Under these circumstances, no reasonable finder of fact could conclude that Shank's belated accusation about Galaway when communicated to Horak became a *substantial* or *motivating* factor in Horak's decision to terminate the contract.

### III. CONCLUSION

The plaintiffs may have had a contract claim. It is clear, however, that they never had a constitutional claim. Accordingly,

---

[8]Since the evidence shows that Horak had no knowledge of the accusations regarding Keezer until he spoke with Shank after notice had been given, a fact-finder could not find that the threat of termination was prompted by accusations that Shank had yet to make to Horak.

IT IS ORDERED that:

1. The defendants' motion for summary judgment (filing 31) is granted.

2. A separate judgment shall be entered dismissing this case with prejudice.

February 27, 2008.                    BY THE COURT:

                                       s/*Richard G. Kopf*
                                       United States District Judge